**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

        **Plaintiff,**

        v.

[1] MICHAEL CABÁN-CANCEL,

        **Defendant.**

**CRIM. NO. 25-198 (RAM)**

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court are Defendant Michael Cabán-Cancel's ("Defendant" or "Mr. Cabán") *Motion to Suppress Evidence and Statements* (the "*Motion*") as well the parties' post-suppression briefs in support of their arguments. (Docket Nos. 26, 54, and 55). The Court hereby **NOTES** the parties' post-suppression briefs at Docket Nos. 54 and 55 and, for the reasons set forth below, **DENIES** the *Motion* at Docket No. 26.

**I.    PROCEDURAL BACKGROUND**

On April 13, 2025, a *Criminal Complaint* was filed against Mr. Cabán for possession of a firearm by a prohibited person. (Docket No. 1). The *Affidavit in Support* of the *Criminal Complaint* provides the following relevant facts to support probable cause: (1) while conducting a preventative patrol, Carolina Municipal Police Department ("CMPD") officers driving in a police cruiser entered the rear-parking lot of Hotties Bar and Restaurant ("Hotties");

(2) Mr. Cabán was observed with a firearm grip and extended-pistol magazine sticking out of his waistband; (3) a CMPD officer asked whether Mr. Cabán had a Puerto Rico Firearm's license and Mr. Cabán took off running; (4) the CMPD officer pursued Mr. Cabán on foot as he ran and observed Mr. Cabán reaching for his waistband and then a pistol magazine dropping to the ground; (5) Mr. Cabán was subsequently apprehended and placed under arrest; (6) during the search incident to arrest, a Glock 27 Pistol was recovered; lastly (7) an effort was made to recover the magazine that was dropped to the ground, however the magazine was not recovered. (Docket No. 1-1 ¶¶ 8-9). On April 23, 2025, a grand jury returned a one-count *Indictment* charging Mr. Cabán with Possession of a Firearm by a Prohibited Person (Felon) in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Docket No. 12).

On November 10, 2025, Defendant filed the instant *Motion*, contesting the United States of America's (the "Government") version of events and moving to suppress all physical evidence and statements obtained as a result of an unconstitutional seizure on April 12, 2025, in violation of the Fourth Amendment to the United States Constitution. (Docket No. 26). Defendant alleges that after leaving Hotties at approximately 4:45 a.m., he was walking to a friend's car for a ride when a Police vehicle stopped next to him. Id. at 2-4. Then, a police officer aimed his flashlight at Defendant and told him to stop. Id. at 4. Defendant ran and was

ultimately apprehended and arrested by an officer. Id. Defendant contends that the Government's proffered reason for the stop, specifically, that an officer viewed a firearm grip and extended pistol magazine were sticking out of Mr. Cabán's waistband, is contradicted by: (1) the surveillance video footage showing that Mr. Cabán was merely standing in a well-lit, populated area with no firearm or magazine visible at his waistband; and (2) the officers' failure to recover the extended magazine he allegedly dropped. Id. at 5-8. Mr. Cabán contends that the officers lacked reasonable suspicion to initiate the stop and that the encounter constituted a seizure at its inception. Id. at 8-10. Moreover, Defendant argues that the unlawful stop cannot be retroactively justified by his subsequent flight. Id. at 10-11.

On January 1, 2026, the Government filed a *Response in Opposition*. (Docket No. 30). The Government insists that CMPD officers had reasonable suspicion that Defendant was in possession of a firearm and magazine, as they were viewed in plain sight, and thus could lawfully conduct an investigative stop to verify if he was possessing it legally. Id. at 3-4. Once Mr. Cabán fled, the Government posits that that officers could expand their investigation and pursue the fleeing individual as well as conduct a search incident to arrest once he was apprehended. Id. at 4-7.

On January 20, 2026, Defendant filed his *Reply* to the Government's *Opposition*. (Docket No. 31). Therein, Defendant

reiterates that the surveillance video footage shows Defendant walking to the parking lot with no firearm visible in his waistband or elsewhere and that the magazine allegedly dropped by Defendant was never recovered. Id. Moreover, Mr. Cabán notes that the CMPD officer was running behind Defendant, making it unclear how he could observe Defendant's frontal waistband. Id.

The Court held a suppression hearing on March 11 and 19, 2026. (Docket Nos. 45 and 48). The Government presented the testimony of CMPD officers Josban Vélez-Torres ("Officer Vélez") and Fernand Méndez-Sosa ("Officer Méndez"). (Docket No. 45). The Defense also presented the testimony of Mr. Cabán as well as Federal Agent Adolfo Avilés-Hernandez ("Agent Avilés"), who drafted the *Criminal Complaint*, as an impeachment witness. (Docket No. 48). Both parties presented maps of the area and surveillance video footage as exhibits.

On April 17, 2026, the parties filed post-suppression hearing briefs in support of their respective positions. (Docket No. 54 and 55).

## II.  APPLICABLE LAW

The Fourth Amendment establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The exclusionary rule makes the Fourth Amendment enforceable by prohibiting the fruits of an unreasonable search or seizure from

being admitted at trial. United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011); *see also* Wong Sun v. United States, 371 U.S. 471, 484-85 (1963) (discussing the "fruits" of unreasonable searches and seizures). When a defendant moves to suppress evidence under the Fourth Amendment, he has the burden of showing his Fourth Amendment rights were violated. United States v. Rheault, 561 F.3d 55, 58-59 (1st Cir. 2009) (citing Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978)).

### III. FACTUAL FINDINGS

In light of the parties' filings as well as the testimony and evidence presented at the March 11 and 19, 2026 suppression hearing, the Court makes the following findings of operative facts:

1. Officer Vélez has served as a Carolina Municipal Police Officer for twenty-two years. During this time, he has participated in more than 300 interventions regarding illegal firearms.

2. Officer Méndez has served as a Carolina Municipal Police Officer for approximately 11 years and has participated in over one-hundred fifty police interventions throughout this time.

3. In the early morning hours of April 12, 2025, Officer Vélez and Officer Méndez (collectively the "Officers") were conducting a preventive patrol in the area of Isla Verde.

4. That day, they were using patrol unit 884 of the CMPD. It is a duly marked unit.

5. Officer Vélez was sitting in the front passenger seat of the vehicle and Officer Méndez was driving.

6. The Officers were informed that a fight had broken out at Hotties in Isla Verde. They went to that location to provide support to fellow officers accordingly.

7. Nothing on the radio mentioned that a specific person was part of the fight.

8. Mr. Cabán was at Hotties celebrating a birthday. He was wearing all white.

9. At approximately 4:50 a.m., Defendant was with his friends, leaving Hotties.

10. In the surveillance video footage showing Mr. Cabán walking with other individuals, a firearm is not visible on his waistband.

11. At approximately 4:54 a.m., Mr. Cabán was in the back part of the Hotties parking lot, looking for his house keys and telephone in a car, as a friend was going to drive him home.

12. Upon arriving at Hotties, the Officers saw police units already handling the situation in front of the business.

13. At approximately 4:55 a.m., the Officers proceeded to enter the parking lot area for Hotties, which is also shared with

the Tryp Hotel, to corroborate that everything was okay at the back of the establishment.

14. The parking lot was very well lit by the light that comes from all the nearby businesses and power poles placed throughout the parking.

15. Upon entering the parking lot, everything appeared to be fine on the right side of the lot and thus the Officers proceeded to move forward to the back of the parking lot.

16. The police unit had its high beam lights on at all times and was moving at a slow speed to observe the surrounding area.

17. The Officers observed a group of eight to ten people in the back of the lot.

18. Officer Vélez saw Defendant in that group of people. Mr. Cabán was wearing all white clothes and had his shirt untucked.

19. The Officers also saw another individual wearing orange/red clothing, specifically a hoodie.

20. Mr. Cabán was in front of the police unit, approximately 8-10 feet away. Mr. Cabán was walking towards his friend's vehicle because he was going to get a ride home. The headlights of the police unit were shining towards Defendant.

21. Officer Vélez observed that Mr. Cabán had a black, visible pistol in the middle of his waist.

22. Officer Vélez informed Officer Méndez that the person wearing white had a firearm and instructed Officer Méndez to stop the patrol car.

23. Once the police unit stopped, Officer Vélez opened the door and without losing sight of Mr. Cabán, asked him to show his permit to carry a firearm. Mr. Cabán continued walking toward the right side of the patrol car, ignoring Officer Vélez's request.

24. Officer Méndez got out of the unit to aid his fellow officer.

25. The surveillance video footage shows Officer Méndez reaching out to Mr. Cabán as he was walking past the officers.

26. Mr. Cabán testified that one of the Officers got out of the vehicle and said to him "stop right there *cabrón*."

27. Officer Vélez approached Mr. Cabán and Mr. Cabán then began running towards the entrance of the parking lot and Isla Verde Avenue.

28. Mr. Cabán testified that the Officers did not identify themselves as police officers.

29. Surveillance video footage shows the Officers dressed as police officers.

30. Defendant testified that because one of the Officers tried to grab his arm, and spoke with him with such a bad attitude, he reacted by running away.

31. Officer Méndez continued running after Mr. Cabán.

32. Officer Vélez had initially started to run but then stopped to stay with the police unit, as it was on and could not be left unattended.

33. Officer Vélez used the four-way radio to report that there was an individual wearing all white running with a firearm on his waist.

34. Officer Méndez was running approximately 9 to 10 feet behind Mr. Cabán. Upon arriving to the area where tickets are issued for the parking, he observed that Mr. Cabán touched the right side of his waist with his right hand, pulled up his shirt, and released a magazine that was black and had ammunition.

35. At that point Officer Méndez was able to see the butt of the firearm.

36. Officer Méndez testified that Glock pistols have a button that when pressed, releases the magazine. Officer Méndez testified that he saw Mr. Cabán do this and that it was unnecessary for Mr. Cabán to take the firearm out to release the magazine.

37. Officer Méndez slowed down a bit but then continued running after Mr. Cabán.

38. Surveillance video footage shows something landing on the floor after Mr. Cabán ran past the parking ticket area.

39. Surveillance video footage shows that after Defendant and Officer Méndez ran by the parking ticket area, the individual

with the orange/red hoodie that was originally in the group with Mr. Cabán subsequently picked something up from the ground in the same place that the magazine fell per Officer Méndez's testimony. It is the same thing that appears to have fallen on the ground per the surveillance video footage.

40. Officer Méndez was able to catch up with Mr. Cabán at the entrance of the parking lot. He quickly placed Mr. Cabán under arrest, informed him of the reason for the stop (carrying a firearm without a permit) and seized a black Glock pistol, without a magazine, from him.

41. Officer Vélez exited the parking lot with the patrol unit and saw that Officer Méndez had Mr. Cabán handcuffed. He also saw that Officer Méndez had a firearm seized from Mr. Cabán.

42. Officer Méndez told Officer Vélez that there was a part missing, namely the magazine of the pistol.

43. The Officers proceeded to look for the magazine. They specifically followed the path that Mr. Cabán had run down to try to find the missing magazine. They looked around plants, along the street, in the area around guard booth, and everywhere else they could in the parking lot. However, the Officers did not find the magazine.

44. The Officers also searched for the magazine in the back part of the parking lot, where the intervention began. There, Officer Vélez found a .45 caliber firearm with several rounds

of ammunition magazines between a tire of a pickup truck. The truck was near where the Officers had originally seen Mr. Cabán and the group of people he was with.

45. Per Officer Méndez's notes, he saw the firearm but did not specify when. He testified that he saw it when Mr. Cabán let go of the magazine.

46. Agent Avilés has been a special agent with Homeland Security since September 2025. Before then, he worked as a special agent with the Bureau of Alcohol Tobacco and Firearms and Explosives ("ATF") for approximately two years. He was working with ATF on the date of Mr. Cabán's arrest.

47. Agent Avilés drafted the sworn *Criminal Complaint* and *Report of Investigation* ("ROI") in this case with information derived from an interview with Officer Méndez a few hours after Mr. Cabán's arrest.

48. Agent Avilés' ROI is a summation of the interview, not a verbatim transcript of the witness' words.

49. During the interview, Agent Avilés took general notes of what Officer Méndez said.

50. Agent Avilés testified that Officer Méndez "explained that he observed an individual later identified as [Mr. Caban] with a firearm grip and an extended magazine on his waistband area;" he asked Mr. Cabán if he had a license for the firearm, and then Mr. Cabán said no and took off running.

51. Agent Avilés did not review the surveillance video footage before writing the ROI.

52. Agent Avilés never interviewed Officer Vélez.

53. Agent Avilés never received the report prepared by Officer Méndez regarding this case because he was transferred out of ATF to Homeland Security and was no longer the case agent in this case.

54. Agent Avilés did not discuss the content of his ROI with Officer Méndez.

55. Officer Méndez testified at the suppression hearing that Agent Avilés' notes should have reflected that it was Officer Vélez that initially informed him of the presence of a firearm on Mr. Cabán's person.

56. On day of his arrest, April 12, 2025, Mr. Cabán was on federal supervised release.

## IV.  DISCUSSION

### A. Defendant was initially detained in a lawful *Terry* stop

Law enforcement may detain individuals for a brief, warrantless investigatory stop "'based on a reasonable suspicion that criminal activity may be afoot.'" United States v. Rasberry, 882 F.3d 241, 246 (1st Cir. 2018) (quoting United States v. Pontoo, 666 F.3d 20, 27 (1st Cir. 2011)). These detentions are called *Terry* stops, which do not violate the Fourth Amendment's prohibition on "unreasonable" searches and seizures. United States v. Dapolito,

713 F.3d 141, 147 (1st Cir. 2013) (citation omitted); *see* Terry v. Ohio, 392 U.S. 1 (1968). An individual faces detention by law enforcement "when a reasonable person would not feel free to refuse to answer police questions and proceed along his way." Dapolito, 713 F.3d at 147.

A court evaluating whether a detention constitutes a *Terry* stop "must consider whether (1) reasonable suspicion justified the stop at its inception, and (2) whether the actions of law enforcement officers during the stop were reasonably related in scope to the circumstances justifying the stop." United States v. Acevedo-Vázquez, 335 F.Supp. 3d 263, 269 (D.P.R. 2018) (citing United States v. Tiru-Plaza, 766 F.3d 111, 119 (1st Cir. 2014)). "[A] finding of reasonable suspicion must be premised upon 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Pontoo, 666 F.3d at 27-28 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The reasonable suspicion standard "'defies precise definition' and 'must be determined case by case,'" but is fundamentally a commonsense matter. Dapolito, 713 F.3d at 148 (quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001); citing Ornelas v. United States, 517 U.S. 690, 695 (1996)). It makes "due allowance for police officers to draw upon their experience and arrive at inferences and deductions that may well elude an untrained person." United States v. Trinidad-Nova, 731 F.Supp. 3d 273, 280 (D.P.R.

2024) (internal quotation marks and citation omitted). "The particularity requirement demands that the finding be 'grounded in specific and articulable facts.'" Dapolito, 713 F.3d at 148 (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)). The objective basis of a stop is determined "through the lens of a reasonable police officer," not an officer's subjective view. Dapolito, 713 F.3d at 148 (citation omitted); *see* Trinidad-Nova, 731 F.Supp. 3d at 280. When reaching its decision, a court should consider the "totality of the circumstances surrounding an encounter." United States v. Romain, 393 F.3d 63, 75 (1st Cir. 2004) (citation omitted).

Should a *Terry* stop become too intrusive, it morphs into a *de facto* arrest. Rasberry, 882 F.3d at 247. While there is no bright-line rule for distinguishing a *Terry* stop from an arrest, the transition occurs when, under the totality of the circumstances, "a reasonable person in the suspect's position would have understood [his] position to be tantamount to being under arrest." United States v. Fernandez Ruiz, 425 F.Supp. 3d 82, 86 (D.P.R. 2019) (internal quotation marks and citation omitted). Factors include "the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect, and the information conveyed to the suspect," "as well as the surroundings, duration, and character of the interrogation." Id. (quotation and citation omitted).

###    i.    Reasonable suspicion justified the initial stop

The Court finds that Agent Vélez's testimony that he saw a firearm on Defendant's person is credible. To make this determination, the Court considers that: (1) Defendant was wearing light colored clothes in a well-lit parking lot; (2) he was eight to ten feet in front of the police vehicle and subsequently began walking towards the police vehicle; (3) the police vehicle was, in turn, moving slowly and had its high beam lights on shining in Defendant's direction.

The Court is not persuaded that the Officers' testimony is not credible because it differs from Agent Avilés' notes and report. Agent Avilés did not interview Officer Vélez, did not review Officer Méndez' notes, and did not consult Officer Méndez after preparing his report to corroborate its accuracy. Officer Méndez and Officer Vélez's testimony are consistent with one another and with the surveillance video footage. The Court further rejects the argument that the Officers' testimony is not credible because a firearm is not visible on Mr. Cabán's waist in the surveillance video footage. Quality of the video aside, the footage where Mr. Cabán's front waistband is most visible was taken while Defendant was leaving Hotties and going to the parking lot, prior to stopping at a vehicle to retrieve his phone and keys. Thus, the video does not conclusively show that Mr. Cabán did not have a firearm, as he had the opportunity to subsequently place one on

his waistband at the time he retrieved his phone and keys. Lastly, Defendant's argument that the Officers' account of the magazine defies common sense is belied by surveillance video footage showing Defendant drop something while running away from Officer Méndez.

The fact that Defendant was seen with a firearm in his waistband, coupled with the fact that the Officers arrived at Hotties to provide assistance after a fight broke out at the establishment, is sufficient to establish reasonable suspicion. *See* United States v. Trinidad-Nova, No. CR 22-419 (FAB), 2024 WL 165075, at *3 (D.P.R. Jan. 16, 2024), report and recommendation adopted, 731 F. Supp. 3d 273 (D.P.R. 2024)(noting that although defendant's evasiveness was not particularly suspicious, once the officer identified that defendant was reaching for a firearm in his waist, there was a particular and objective basis to believe that the defendant was armed and dangerous); United States v. Tanguay, 918 F.3d 1, 3 (1st Cir. 2019) (finding that sight of a BB gun in the driver-side door justified measures to protect the officers and others during a *Terry* stop); and United States v. Stanley, 915 F.2d 54, 56 (1st Cir. 1990) (quotation omitted)("[c]onduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer."). This suspicion was heightened when Mr. Cabán ignored Officer Vélez's questioning regarding whether he had a permit for the firearm. *See* United States v. McCarthy, 77 F.3d 522, 531 (1st

Cir. 1996) (concluding that although defendants have a constitutional right not to answer any questions, incomplete and vague responses can "reasonably eighteen the officers' suspicion" that the defendant was participating in criminal activity); United States v. Maguire, 359 F.3d 71, 77 (1st Cir. 2004)(finding reasonable suspicion where defendant was providing evasive responses to offers' questions and walking away from officers).

### ii. The Officers' actions during the stop were reasonably related to the reasons for the stop

"[T]he inquiry under *Terry* does not end with a finding of reasonable suspicion. For the warrantless stop to be valid under *Terry*, 'the scope of the detention must be carefully tailored to its underlying justification.'". Trinidad-Nova, 2024 WL 165075, at *3 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983). Although "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case...an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Royer, 460 U.S. at 500. Moreover, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id.

Here, the Officers' actions taken during the stop were reasonable given the underlying justification for the stop and the least intrusive necessary. First, Officer Vélez verbally inquired

as to whether Defendant was lawfully possessing the firearm. Then, once Mr. Cabán evaded the question and walked past the Officers, Officer Méndez attempted to grab and stop Mr. Cabán. When Mr. Cabán began running away, Officer Méndez followed suit and ran after him. All these interventions happened in a matter of seconds and were related to the underlying reasonable suspicion, *i.e.*, that Mr. Cabán was unlawfully possessing a firearm and could be dangerous. *See* Young, 105 F.3d at 7 (citations and quotations omitted)("Weighing the limited violation of the individual's privacy against the opposing interests in crime prevention and detection and in the police officer's safety, we conclude that [the officer's] lunge at [defendant], and the attendant physical contact, were reasonable in scope and the circumstances [*i.e.*, sight of a gun] justified the intrusion."); United States v. Jones, No. 07CR10280-NG, 2008 WL 5216251, at *2 (D. Mass. Dec. 11, 2008)(finding that given the information the officer had, including observing that defendant was checking what could be a gun in his waistband, there was reasonable suspicion justifying a *Terry* stop consisting of questioning defendant whether he had a license to carry the gun).

Given that the Officers had reasonable suspicion to stop Mr. Cabán and because their actions were reasonably related to the scope of the circumstances justifying the stop, Defendant was subject to a lawful *Terry* stop and his Fourth Amendment rights

were not violated. *See* Acevedo-Vázquez, 335 F.Supp. 3d at 269;

Dapolito, 713 F.3d at 147.

**B. There was probable cause for arrest and thus the search incident to arrest was proper**[1]

When the specific facts that constitute reasonable suspicion to warrant a *Terry* stop further evince probable cause that a crime has been committed or is about to be, officers may arrest the individual without a warrant. *See, e.g.,* Maryland v. Pringle, 540 U.S. 366, 370 (2003); United States v. Fiasconaro, 315 F.3d 28, 34-35 (1st Cir. 2002)(quotations omitted and cleaned up)("Probable cause exists when the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.").

As discussed above, the Officers had reasonable suspicion to briefly stop Defendant and inquire as to whether he had a valid permit to possess a firearm. Defendant's reaction to that inquiry, namely running away from the officers, and subsequently being viewed grabbing the firearm and releasing the magazine in plain view, provided probable cause to arrest. *See* Jones, 2008 WL 5216251, at *2 (concluding there was "clearly" probable cause for

---

[1] The Court notes that this matter was not raised by Defendant in his *Motion*, rather, he contends that because the *Terry* stop was unlawful, the resulting arrest and search violated his constitutional rights. (Docket No. 26 at 8-11).

arrest where defendant ran away and violently struggled for his gun after an officer conducted a valid *Terry* stop inquiring as to whether defendant had license to carry a gun).

Following the arrest, Officer Méndez conducted a permissible search incident to arrest and recovered a firearm without a magazine from Defendant's person. *See* <u>Smith v. Ohio</u>, 494 U.S. 541, 543 (1990) ("The exception [to the Fourth Amendment] for searches incident to arrest permits the police to search a lawfully arrested person and areas within his immediate control.").

## V. CONCLUSION

For the foregoing reasons, the parties' post-suppression hearing briefs at Docket Nos. 54 and 55 are **NOTED** and Defendant's *Motion to Suppress* at Docket No. 26 is **DENIED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 7th day of May 2026.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE